**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARQUISE DEANGELO LOFTIS, <br><br> Petitioner, <br><br> v. <br><br> DEBBIE ASUNCION, Warden, <br><br> Respondent. | Case No.: 17cv1805-MMA (NLS) <br><br> **ORDER** <br><br> **(1) GRANTING MOTION TO DISMISS PETITION;** <br><br> **(2) DENYING MOTION TO APPOINT COUNSEL;** <br><br> **(3) DISMISSING PETITION FOR WRIT OF HABEAS CORPUS; AND** <br><br> **(4) DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY** |

    Marquise Deangelo Loftis  (hereinafter "Petitioner") is a state prisoner proceeding *pro se* and *in forma pauperis* with a Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.[1]  (ECF No. 1.)  Petitioner is currently serving a sentence of 22 years and

---

[1]  Although this case was randomly referred to United States Magistrate Judge Nita L. Stormes pursuant to 28 U.S.C. § 636(b)(1)(B), the Court has determined that neither a Report and Recommendation nor oral argument is necessary for the disposition of this matter.  See S.D. Cal. Civ.L.R. 71.1(d).

4 months in state prison following a 2010 guilty plea entered in the San Diego County Superior Court to attempted murder, carjacking, robbery and making a criminal threat, with admissions he used a firearm and inflicted great bodily injury. (Id. at 1-2; Lodgment No. 4, Clerk's Tr. ["CT"] at 167-70.) Petitioner claims his state and federal rights were violated because he did not have a competency hearing prior to entering his plea (claim one), he received ineffective assistance of counsel due to the failure of his trial counsel to investigate his mental condition which would have revealed he was incompetent to stand trial or enter a plea (claim two), the trial court abused its discretion in denying his motion to withdraw the plea because the prosecution did not refute his expert testimony showing he was not competent to enter a plea (claim three), his sentence is illegal because he was not competent to enter a plea (claim four), and the trial judge did not conduct a fair and impartial hearing on his motion to withdraw the plea (claim five). (ECF No. 1 at 7-21.)

Respondent has filed a Motion to Dismiss the Petition, along with a Notice of Lodgment of the state court record and Petitioner's prison medical records. (ECF Nos. 11-12.) Respondent contends the Petition is facially untimely because it was filed nearly five years after the one-year statute of limitations began to run. (Memorandum of Points and Authorities in Support of Motion to Dismiss ["MTD Mem."] at 6-17.) Respondent argues that: (a) statutory tolling is not available for Petitioner's state collateral review petitions because they were filed two and one-half years after the federal statute of limitations expired, (b) he is not entitled to equitable tolling based on his mental condition because his medical records indicate his condition is mild or moderate and has been effectively treated, and (c) the "actual innocence" exception to the statute of limitations does not apply because Petitioner has acknowledged that the evidence of his guilt is strong. (Id.)

Petitioner has filed an Opposition. (ECF No. 15.) He concedes equitable tolling is necessary for his Petition to be timely, and argues it is available due to "lifelong organic brain/cognitive defects and severe mental illness" which prevent him from preparing and filing court pleadings. (Id. at 1.) He has also filed a Motion to Appoint Counsel contending his mental condition prevents him from adequately opposing the motion to dismiss without

17cv1805-MMA (NLS)

the assistance of counsel, and that counsel must be appointed if the Court conducts an evidentiary hearing or orders discovery on the issue of equitable tolling. (ECF No. 19.)

For the following reasons, the Court finds that the records presented in support and opposition to the instant motion, which range from Petitioner's birth to the present, do not demonstrate a mental impairment sufficient to entitle him to equitable tolling, but even accepting as accurate and credible the antidotal evidence in his declarations that he suffered from such an impairment during the relevant time period, and allowing for statutory and equitable tolling to the fullest extent permissible under those facts, the Petition is untimely. The Court also finds the "actual innocence" exception to the statute of limitations does not excuse the untimely filing, and appointment of counsel is discretionary and unwarranted. Accordingly, Petitioner's Motion to Appoint Counsel is **DENIED**, Respondent's Motion to Dismiss is **GRANTED**, the Petition is **DISMISSED** with prejudice as untimely, and the Court **DECLINES** to issue a certificate of appealability.

## I.    PROCEDURAL HISTORY

In a 17-count Second Amended Information filed in the San Diego County Superior Court on May 3, 2010, Petitioner was charged with seven counts of assault with a firearm in violation of California Penal Code § 254(a)(2) (counts 1, 4, 6, 8, 10, 11 and 14), six counts of robbery in violation of Penal Code § 211 (counts 2, 5, 7, 9, 12 and 15), one count of carjacking in violation of Penal Code § 215(a) (count 3), one count of attempted murder in violation of Penal Code § 187(a) (count 13), one count of making a criminal threat in violation of Penal Code § 422 (count 16), and one count of battery in violation of Penal Code § 242 (count 17). (CT 43-50.) Sentence enhancements alleged Petitioner personally used a handgun within the meaning of Penal Code § 12022.5(a), personally inflicted great bodily injury within the meaning of Penal Code § 12022.7(a), intentionally and personally discharged a handgun within the meaning of Penal Code § 12022.53(b), intentionally discharged a handgun within the meaning of Penal Code § 12022.53(c), and intentionally and personally discharged a handgun which proximately caused great bodily injury within the meaning of Penal Code § 12022.53(d). (Id.) The charges are summarized as follows:

**Counts 1-7; June 21, 2009; carjacking; assault with a firearm; robbery**

Nickolas Bernstein and his two passengers gave Petitioner and his friend a ride home after a party. When Petitioner got out he pointed a handgun at Nickolas' head, robbed all three men and took Bernstein's car.

**Counts 8-9; June 26, 2009; assault with a firearm; robbery**

Acel Cruz, the manager of a Chuck E. Cheese store, was counting receipts in his office when Petitioner entered, pointed a handgun at Cruz, and demanded money from an open safe and cash drawers.

**Counts 10-12; July 15, 2009; assault with a firearm; robbery**

Officers Ramiro Meza and Michael Kosak were working as Trolley Security Guards at the Encanto station when Petitioner approached Meza from behind, pointed a handgun at him, told him to get on the ground, and took his gun and ammunition clips.

**Counts 13-15; July 18, 2009; attempted murder; assault with a firearm; robbery**

Officer David Reynoso was working as a Trolley Security Guard at the Grossmont station when Petitioner pointed a handgun at him and ordered him to give him his gun. Reynoso said "ok" and moved his hand toward his gun, at which point Petitioner shot him once in the shoulder and once in the groin, and took his gun.

**Counts 16-17; July 20, 2009; making a criminal threat; battery**

Officer Donny Lamora was working as a Trolley Security Officer at the 62nd street station when Petitioner approached, punched Lamora, formed the shape of a gun with his hand, and told him several times he was going to be the next guard to be shot.

(CT 369-71.)

A jury trial began on Monday, May 3, 2010, and a jury was empaneled at the end of the day on Tuesday, May 4. (CT 409-14.) Trial resumed on Thursday, May 6, the first and only day testimony was presented, with the prosecution calling eight witnesses. (CT 415-18.) Nickolas Bernstein testified that he was driving his car with two friends as passengers when they were asked for a ride by Petitioner, who he identified in court, and a man with Petitioner. (Lodgment No. 5, Reporter's Tr. ["RT"] at 112-15, 126.) When they arrived where Petitioner asked to be dropped off, he pulled out a handgun, pointed it at

Bernstein's head, robbed him of his money and cell phone, and drove off in his car. (RT 115-20.) Bernstein's two friends testified to the same events, both identified Petitioner in court, and both testified he robbed them of their money and cell phones at gunpoint. (RT 143-66.) Police officers and a criminalist testified that Bernstein's vehicle was found with significant damage after being involved in a hit-and-run collision shortly after it was stolen, that a tube of Chapstick lip balm which did not belong to any of the victims and which contained Petitioner's DNA was found inside the car where Petitioner was seated when Bernstein gave him a ride, and that Bernstein and his two friends thereafter identified Petitioner from a photographic lineup. (RT 179-82, 188-94, 210-11, 220.) The trial was adjourned for the day.

The next day, Friday, May 7, Petitioner, who was in custody, did not appear due to "a medical issue," and the trial was continued until Monday, May 10. (CT 419.) Petitioner appeared in jail clothes that Monday, and his court-appointed defense counsel, Daniel Cohen, informed the court Petitioner had not appeared the previous Friday because he had attempted to hang himself Friday morning, that he now appeared depressed and would provide only yes or no answers to counsel's questions, and although he had been engaged and interested in plea negotiations on the previous Thursday he now said he did not care about anything and just wanted to die. (RT 244-46; CT 233-34.) Attorney Cohen informed the court that Petitioner had been given mood stabilizers and antidepressant drugs following his suicide attempt, and said: "In my opinion, it seemed to be that I was having a very hard time communicating with him in any sort of meaningful way that could assist me in the trial." (RT 246.) Attorney Cohen said he was not aware of any mental issues prior to the suicide attempt, although he was aware Petitioner had twice previously been placed on suicide watch at the jail based on statements he made to his girlfriend and in a letter. (RT 247, 253.) The following exchanged then occurred:

> Trial Judge: In terms of Mr. Loftis and his mental health status at the present time, I have to indicate that as a result of one of the motions in this case, I've had an opportunity to review recordings, audio recordings, of a number of conversations Mr. Loftis had. They appear to be conversations in later

summer, maybe early fall of last year, and from those, it would be clear to any reasonable listener that Mr. Loftis is quite an intelligent, articulate person. So I'm kind of surprised at this point that we're addressing his ability to comprehend the proceedings due to some form of mental illness. And apparently, it isn't that. The conclusion I reach from your comments is that he's depressed, and apparently he's depressed about the nature of the evidence in the case and the responsibility that he suffer some severe punishment. Would that be a fair assessment of the situation?

Attorney Cohen: Yes and no. I think that the court is correct, and I think Mr. Loftis is an intelligent person, and I think he has the capabilities of understanding what's going on. At least in the past, I haven't made a 1368 motion[2] because of the fact that he has been engaged. [¶] Where I differ from the court is I don't feel this is a run-of-the-mill depression, mundane blues. I'm afraid that the depression he's suffering from would qualify as a mental illness, and true depression can be extremely debilitating. Just because it's something that some people suffer from and something that's treatable doesn't mean that it's not a mental illness, that it's not something that could affect the proceedings and his ability to understand what's going on and to meaningfully communicate with me.

(RT 247-48.)

The trial judge then questioned Petitioner regarding his mental state and the effects of his medication. (RT 248-52.) Petitioner said he did not know why he decided not to dress out for court that day, indicated that after his suicide attempt he was given medication for depression, to stabilize his mood and to help him sleep, and when asked about his present mental state said: "I'm feeling bad because I'm never going to see my son again." (Id.) The judge ruled the trial would continue, and called a 15-minute recess for Petitioner

---

[2] California Penal Code § 1368 requires "the trial court to initiate proceedings in order to determine a defendant's present sanity if a doubt arises in the mind of the judge as to the mental competence of the defendant or [i]f counsel informs the court that he or she believes the defendant is or may be mentally incompetent. To be competent to stand trial, defendant must have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him." People v. Ramos, 34 Cal. 4th 494, 507 (2004) (internal quotation marks omitted).

to dress out if he wished to do so.  (RT 252-54.)

After the recess, Petitioner entered a guilty plea pursuant to a plea agreement.  (RT 255-64.)  He waived his constitutional rights and pleaded guilty to attempted murder, carjacking, making a criminal threat and two counts of robbery, and admitted he personally used a firearm and personally inflicted great bodily injury.  (Id.)  The twelve remaining counts (seven counts of assault with a firearm, four counts of robbery, and one count of battery) were dismissed, and the matter was continued to July 8, 2010 for sentencing on a stipulated term of 22 years and 4 months in prison.  (Id.)  Immediately after he entered the plea, the trial judge stated: "I do find, Mr. Loftis, that you are in full possession of your faculties.  You've made a knowing, intelligent, and voluntary waiver of your rights.  I do accept the pleas of guilty, the admission on the special allegations that are attendant to those charges that you pled guilty to, and I accept your pleas of guilty." (RT 262.) Attorney Cohen signed the change of plea form attesting he had explained the contents to Petitioner, that they had discussed the charges, possible defenses and consequences of the plea, and that he concurred in the plea and the waiver of constitutional rights. (CT 169.)  Three days later Petitioner participated in a "free talk" with the prosecution in which he admitted he committed the crimes charged, and admitted involvement in an uncharged bank robbery. (Lodgment No. 4, Augmented Clerk's Tr. at 8-9, 24-46.)

On July 8, 2010, the date set for sentencing, attorney Cohen informed the court that Petitioner wished to file a *pro se* motion to withdraw his guilty plea.  (CT 422.)  Attorney Cohen did not join the motion, stating: "I don't believe there's a basis for [it]."  (Lodgment No. 5, Augmented Reporter's Tr., July 8, 2010 at 4.)  He was relieved at that time, and new counsel, attorney Gary Roberts, was appointed on July 18, 2010.  (CT 422.)

Attorney Roberts filed a motion to withdraw the plea on October 20, 2010. (CT 175-264.)  The motion alleged Petitioner spent the weekend before his plea in a constantly illuminated "safety cell, aka, a rubber room" without clothing where he had difficulty sleeping, and at the time of the plea "had insufficient sleep and clarity of mind to be able to make a responsible decision whether to take a plea bargain requiring him to serve 22

years and four months in prison at 85% time." (CT 268-69.) It was supported by jail medical records and a representation that Dr. Ellen Stein, a licensed clinical and forensic psychologist, was prepared to testify that Petitioner has borderline personality disorder. (CT 175-264.) On October 21, 2010, the motion was augmented to add an allegation of ineffective assistance of counsel on the basis that: "It is difficult to understand how attorney Cohen could concur in the defendant's plea and waiver of constitutional rights just after attorney Cohen said to the court, 'I was having a very hard time communicating with him in any sort of meaningful way that could assist me in the trial.'" (CT 265-69.)

On November 24, 2010, the trial judge held an evidentiary hearing on the motion to withdraw the guilty plea, at which Dr. Stein, Petitioner and a defense investigator testified. (RT 266-423.) Dr. Stein testified she diagnosed Petitioner with borderline personality disorder, thought disorder, depression and traumatic stress disorder, that his being housed in an isolation cell the weekend before his guilty plea as a result of his suicide attempt may have disoriented him, and it was unclear whether, by the time he entered his plea, he had recovered from any possible disorientation or even whether it would be obvious to a layperson if he had. (RT 275-83.) She opined that the trial court failed to ask the necessary questions to assess his competency, and neglected the effect of his medications when questioning him and making the determination whether to continue the trial. (RT 286.) Attorney Cohen represented that Petitioner was on mood stabilizers and antidepressants, but she clarified he was on mood stabilizers and antipsychotics. (Id.) Dr. Stein opined that a person with borderline personality disorder could knowingly and intelligently sign a plea agreement (RT 303-04), but that Petitioner's "position was potentially quite compromised, and no one inquired of that." (RT 335.) Several times she was asked directly if in her opinion the plea was not knowing and voluntarily (RT 334-35, 338, 350), but merely stated: "It wasn't the ideal condition under which to have him make a voluntary, knowing judgment. . . . It appeared to me that would not have been the day to take an affirmation of his decision." (RT 350-51.) The parties disagreed in their appellate briefs whether Dr. Stein offered a definitive opinion on the ultimate issue whether the plea was knowing and

voluntary.  (Lodgment No. 1 at 16; Lodgment No. 2 at 17 n. 22.)

On cross-examination, Dr. Stein said she took into consideration that: (a) Petitioner had received an "A" in a criminal law course at a San Diego community college; (b) jail records indicated that at 4:12 a.m. on May 10th he was alert, oriented, responsive and cooperative, and when he was returned to jail after entering his plea that day he told jail staff he took the deal for 22 years and that: "I know I can't beat them.  I'm not suicidal anymore."; (d) the plea bargain he accepted had been on the table for the previous 90 days; (e) after the jury was selected Petitioner was recorded saying: "I'm convicted," "I'm definitely going to jail for life," "They're going to see me in hell before I do life in a cell," and "I got a problem accepting things that I don't want to accept"; and (f) on the evening of the first and only day of trial testimony he was recorded asking his girlfriend: "How do you feel about me signing a deal . . . somewhere in the 20s, 22 maybe.  It's the same deal, but the deal ain't going to be there much longer," and telling her: "It's kind of hard to fight when you got three people coming there and saying that it's me and D.N.A."  (RT 305, 309-16.)

A defense investigator testified that the safety cell in which Petitioner was housed the weekend before he entered his guilty plea is constantly illuminated and monitored by video equipment, is about eight feet square with rubber-coated walls and floor, and has a hole in the floor for a toilet.  (RT 354-64.) Petitioner testified that he was taken to a hospital after his suicide attempt on Friday morning, and was placed in a safety cell wearing only a smock when he returned to jail later that day.  (RT 380.)  When he tied the smock around his neck it was taken away, and he remained in the cell naked until Sunday morning when he was moved to an observation cell and medicated, where he remained until he was taken to court on Monday morning.  (RT 381-83.)  He said that when he signed the change of plea form attorney Cohen had to check the boxes for him because he was crying, and told him if he signed the plea agreement it would stop the trial and they could still negotiate with the District Attorney to lower his sentence.  (RT 383-85.)  He believed at that time that if the trial continued he would be convicted and sentenced to life in prison.  (RT 385.)

He said a West Coast Crips gang member bullied him into committing the crimes, even though Petitioner was not a gang member, but attorney Cohen told him that a duress defense on that basis would be hard to prove. (RT 402-06.) Petitioner was disappointed that attorney Cohen wanted to stick with an "I didn't do it" defense, which Petitioner thought would cause him to spend his life in prison, and felt he had no control over the case. (RT 408-09.) He said he was desperate to "put the brakes on" the trial, but denied that was why he tried to kill himself. (RT 409.) He said he took the deal because he knew he was going to be convicted, and participated in the free talk with the prosecutor three days after he entered his plea believing it was part of the negotiation to lower his sentence. (Lodgment No. 5, Augmented Reporter's Tr., Nov. 24, 2010 at 21, 27.) The trial judge denied the motion to withdraw the plea, stating:

> And Mr. Loftis, I've gotten to know you a little bit just because I heard a lot of your conversations that have been taped, and I appreciate the impact that your incarceration and the charges have had on you. And I'm not dismissing that, and I want to assure you I listened carefully as your attorney presented the testimony of Dr. Stein.

> It was clear to me when I saw you May 10th that you were really down. There was no doubt in my mind. But the question that I was faced with was should the trial continue or was your mental state such that you simply couldn't rationally continue with the trial and assist your attorney. And the purpose of my questions were to reach a conclusion regarding that issue. And I reached the conclusion after that brief interview that even though you truly were down, there was a lot of pressure on you, things were closing in, that you were lucid, coherent. You understood what I was saying, and even though you were reluctant to talk, you would talk. And that's why I said the trial is going to continue.

> Mr. Roberts has made a very creative and powerful argument, "But, judge, you missed the important facts. It wasn't just the way Mr. Loftis appeared in the courtroom, but it was what had happened to him or what he had done to himself over the past four days." And I appreciate the time and effort he's put into this on your behalf to try to flush out those circumstances.

> But my conclusion, after looking at the submission from your attorney, the submission from the District Attorney, and the testimony of Dr. Stein, is

that my decision to continue the trial and my conclusion that you made a knowing, intelligent, and voluntary plea of guilty was on firm ground.

And simply because when I went through very carefully the records that Mr. Roberts presented and the records that Ms. Irving presented, it seems to me that you were thinking about your case. You were aware of the facts of your case. You had talked to Mr. Cohen. Many of the jail tapes talked about getting feedback whether the case was going good, whether the case was going bad, whether the evidence was strong or weak.

During the jury selection, you got the feeling that things weren't going too well just because of your impression of the jurors. You communicated that to a friend. May 6th, you listened to Ms. Irving make an opening statement where she pieced everything together, put on the D.N.A. evidence, and put on the evidence of Mr. Bernstein and the other people that were in the car that you hijacked.

After that, Mr. Cohen made mention of the fact that after the May 6th hearing, you seemed to be interested in the plea bargain. And that's confirmed by your phone call that evening to a friend, that you really are seeing the evidence unfold, and there's just too much evidence. The deal is not going to be on the table too much longer.

I'm not dismissing at all the pressure that you were under, but I have to consider the pressure that any defendant is under when he's charged with extremely serious crimes, and he's facing trial, and the evidence looks kind of overwhelming. That's pressure, per se, based upon the circumstance that you find yourself in. I don't find that that pressure, based upon what Dr. Stein says is a borderline personality disorder, triggered something to the point where you did not understand what the plea was, what your rights were, what the consequences were.

It's quite clear you knew it was going to be 22 years because that's what you'd been mulling over for some time and discussing, particularly with Marissa.[3] You were certainly aware of the circumstances of your case because

---

[3] After the jury was selected, Petitioner was recorded speaking to his girlfriend Marissa saying: "I'm convicted. That's what I think because the jurors were on the cops' side." (RT 313.) The same day he was recorded saying: "I'm definitely going to jail for life. The jury – the jury, they already think I'm guilty cuz I got so many charges. They're going to see me in hell before I do life in a cell." (Id.) After the first and only day of testimony, he

you listened to the full opening statement of Ms. Irving. In terms of voluntary, I thought maybe Dr. Stein would say, "yes, judge, this became involuntary."

But my feeling is that what I did on May 10th was to assure myself that you could continue with the trial. I felt comfortable that you understood my questions. You were giving lucid, coherent responses. And that's all I wanted to do, was continue your day in court, so to speak.

And then I was confronted with your decision to change your plea to guilty. Not only did I review the change of plea form with you, but I asked you some additional questions when I asked you if you understood everything, and I asked you specifically, and other promises made? I heard nothing about, "well, I'm told that this isn't really the plea agreement; that I can whittle it down by discussing it with my attorney." [¶] This is my time now. Your attorney has had several hours to present your case.

You indicated through your attorney that you were really frustrated with Mr. Cohen. From what I gather in terms of your statements as to your factual basis for your defense of duress, that was just magical thinking on your part that that would be a viable defense. Any reasonable attorney, any competent attorney, would say it's not going to work. When somebody says "you've got to show that you're a good value to the gang, you've got to commit some crimes," and you confront somebody with a gun in your hand, that is not going to qualify as duress.

I cannot conclude this is ineffective assistance of counsel when this is not a rational defense. That's not going to work. It's simply not going to fly. That is not ineffective assistance of counsel. That's a good attorney telling you the facts of life.

Since there was going to be a plea agreement, your attorney is trying to do the best job he can for you, which is try to establish reasonable doubt. I, in fact, told you that first day, I was very impressed. That was the direction that Mr. Cohen was taking, and he was obviously prepared to do his best to establish reasonable doubt, in other words, to persuade the jurors that the people had not presented sufficient evidence to prove beyond a reasonable

---

told Marissa: "It's looking bad" and: "It's kind of hard to fight when you got three people coming in there saying that it's me and D.N.A.", and asked her what she thought of him taking a deal in the range of 22 years. (RT 314-15.) Excerpts of his recorded calls are in the record. (Lodgment No. 4, Augmented Clerk's Tr. at 48-65.)

doubt you committed this crime.

As to was it an intelligent act considering all that you were facing, the sadness, the description of your mood? What you told me, the reason you were so down is because you were never going to see your son again. To me, it's a lot of pressure, and it's probably more than the average defendant faces. But I have a lot of cases where people are charged with very serious crimes, and they have to deal with the consequences. And you were trying to deal with them in the best way you knew how.

Is it going to be a roll of the dice, see what happens at trial, or "I'm going to take advantage of what I've decided is going to be 18 years in prison rather than much more than that." Neither of those options were particularly favorable.

It's clear from your jail conversations. I'm very comfortable in concluding that you weighed the options over a period of time. And after the reality of the evidence was presented, you did have a period of decompensation. But when you appeared in my courtroom on May 10th, my conclusion was that you were rational, that you were able to understand the consequences of the plea, the rights that you gave up, and that it was a knowledgeable plea. So the motion to withdraw the plea is denied for those reasons.

(RT 424-29.)

On December 29, 2010, Petitioner was sentenced to the stipulated term of 22 years and 4 months in state prison. (RT 453-55.) He filed a notice of appeal on January 7, 2011, and an opening brief on August 12, 2011, in which his appointed appellate counsel alleged the plea was not knowing and voluntary based on the evidence presented in support of the motion to withdraw the plea. (Lodgment No. 1.) The People responded on December 15, 2011 (Lodgment No. 2), and Petitioner replied on January 6, 2012. (Lodgment No. 3.) On October 3, 2012, Petitioner's counsel filed a notice of abandonment of appeal which stated that Petitioner had asked counsel to abandon the appeal. (Lodgment No. 6.) The appeal was dismissed as abandoned on October 5, 2012. (Lodgment No. 7.) As discussed below, the one-year statute of limitations to file a federal habeas petition began to run the next day, and, absent tolling, expired on October 7, 2013.

On May 6, 2016, over three and one half years after the statute of limitations began to run, Petitioner presumptively constructively[4] filed the first of his four *pro se* petitions seeking state collateral review of his guilty plea, a *pro se* "Notice of Motion and Motion to Vacate Judgment (Petition for Writ of <u>Error</u> <u>Coram</u> <u>Nobis</u>)" in the trial court. (Lodgment No. 8.) He alleged he received ineffective assistance of counsel in connection to his guilty plea due to his trial counsel's failure to discover and present his school and medical records showing that he was not competent to enter his plea because he suffered from Stockholm syndrome, post-traumatic stress disorder, and a brain disorder arising from fetal narcotic ingestion. (<u>Id.</u>) On May 20, 2016, the court denied the petition on the basis that Petitioner had not demonstrated an unknown fact that would have prevented entry of judgment as required for *coram nobis* relief, that his school and medical records were insufficient to show he was legally insane at the time judgment was entered, and because state law provides that a writ of habeas corpus, not error *coram nobis*, is the proper vehicle to raise a claim of ineffective assistance of counsel. (Lodgment No. 9.) He filed a similar *pro se* pleading in the state appellate court on June 12, 2016. (Lodgment No. 10.) That petition was denied on June 21, 2016, in an order which stated: "The filing is treated as a petition for writ of error *coram nobis*. The petition is denied." (Lodgment No. 11.)

On August 3, 2016, he filed a *pro se* petition for writ of habeas corpus in the state supreme court raising claims similar to the ones presented here. (Lodgment No. 12.) That petition was denied on October 12, 2016, in an order which stated: "The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474.)" (Lodgment No 13.) Finally, on February 8, 2017, nearly four months after his first state habeas petition was denied, he filed a second *pro se* habeas petition in the California Supreme Court presenting the claims raised here. (Lodgment No. 14.) It was denied on August 9, 2017,

---

[4] All of Petitioner's *pro se* state and federal filings are considered constructively filed for purposes of the federal statute of limitations on the day they were handed to prison officials for mailing to the Court. <u>Anthony v. Cambra</u>, 236 F.3d 568, 574-75 (9th Cir. 2000). Absent indication otherwise, the Court will presume that is the date they are signed.

17cv1805-MMA (NLS)

in an order that stated: "Petition for writ of habeas corpus denied." (Lodgment No. 15.)

## III.  PETITIONER'S CLAIMS

Petitioner alleges in claim one that his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and under California law, were violated by the failure to hold a competency hearing prior to entering his plea. (ECF No. 1 at 7-9.) He states he was incoherent, incompetent and heavily influenced by his medication, and attorney Cohen's description of his mental state should have prompted a hearing. (Id.)

In claim two he alleges he received ineffective assistance of counsel in violation of the California Constitution and the Sixth Amendment to the United States Constitution due to attorney Cohen's failure to object to him standing trial while incompetent, to conduct a pre-trial investigation into his competence, and by advising him during his guilty plea while incompetent. (Id. at 9-14.) He argues that although attorney Cohen requested a suspension of the trial proceedings based on his mental state, a full investigation would have shown he has suffered from mental illness starting when he was born with drugs and alcohol in his system and deprived of maternal love during his formative years, that he has a family history of mental illness and drug and alcohol problems, and at eleven years old was described by school officials as having had a head injury and being "overactive, hyperactive, overly aggressive, hard to care for and hard to discipline." (Id.)

In claim three he alleges his rights under the Sixth and Fourteenth Amendments to the United States Constitution, and under California law, were violated when the trial court erred in denying his motion to withdraw his plea because the prosecution did not refute the testimony of Dr. Stein that the plea was not knowing and voluntary. (Id. at 14-17.)

In claim four he alleges the imposition of his sentence violated his rights under the California Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution because the court and his counsel were aware his competency was in doubt but failed to prevent him from accepting a plea deal. (Id. at 17-18.)

Petitioner alleges in claim five that his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution were violated because he did not have a fair

17cv1805-MMA (NLS)

1  and impartial hearing on the motion to withdraw his plea because the trial judge questioned

2  witnesses with a prosecutorial bias and bullied defense counsel.  (Id. at 18-21.)

3  **IV.  DISCUSSION**

4  Respondent moves to dismiss the Petition, arguing it is facially untimely because the

5  one-year statute of limitations began to run on October 5, 2012, when Petitioner abandoned

6  his direct appeal, and he waited nearly five years before he initiated this action.  (MTD

7  Mem. at 6-7.)  Respondent argues statutory tolling is unavailable for the time Petitioner's

8  state court pleadings were pending because they were filed after the federal limitations

9  period expired.  (Id. at 7-8.)  Respondent contends the "actual innocence" gateway to avoid

10  the statute of limitations does not apply because Petitioner admits that the evidence against

11  him is strong.  (Id. at 7-9.)  Respondent argues that equitable tolling is unavailable because

12  Petitioner's mental impairment is treatable, transitory, and moderate to mild, and has not

13  prevented him from pursuing numerous state and federal court actions.  (Id. at 9-17.)

14  Petitioner opposes the motion to dismiss, arguing that: "The sole dispute to be

15  resolved here is: Did Mr. Loftis' long established mental impairments continue to disable

16  and prevent him from filing a federal habeas corpus between October 6, 2011 and August

17  27, 2017, thus entitling him to equitable tolling?  Or was treatment effective in treating his

18  impairments." (Pet.'s Opp. at 1.)  He argues Respondent provides a narrow reading of his

19  medical records and ignores the fact that the civil actions he filed while he was exhausting

20  state court remedies in this case were not personally prepared by him but by other inmates

21  at a time when "he had access to help that he did not have before," and that "the level of

22  comprehension necessary to understand the need to timely file was simply beyond [his]

23  cognitive abilities."  (Id. at 1-21.)  He supports his contentions with school records, prison

24  and jail medical records, and declarations from himself, his wife Marissa, and several

25  inmates who assisted him in preparing his pleadings who opine that his mental condition

26  prevented him from personally preparing and filing pleadings.  (Id. at 23-92.)

27  **A.  Triggering Date of the Limitations Period**

28  The one-year statute of limitations applicable to federal habeas petitions pursuant to

28 U.S.C. § 2254 begins to run at the latest of—

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C.A. § 2244(d)(1)(A)-(D) (West 2006).

The parties agree that § 2244(d)(1)(A) provides the triggering date, which is October 5, 2012, the date the state court dismissed Petitioner's direct appeal as abandoned. (MTD Mem. at 7; Pet.'s Opp. at 3.)  The one-year federal statute of limitations began to run the next day, October 6, 2012.  See Patterson v. Stewart, 251 F.3d 1243, 1246 (9th Cir. 2001) (holding that "in computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event, or default from the designated period of time begins to run shall not be included.")  One year later, October 5, 2013, was a Saturday, so the last day a federal habeas petition could be timely filed, absent tolling, was Monday, October 7, 2013.  The instant federal habeas Petition was presumptively constructively filed nearly five years later, on August 27, 2017, the date it is signed.  Anthony, 236 F.3d at 574-75.

Because this action was commenced nearly five years after the statute of limitations began to run, Petitioner correctly concedes it is untimely absent tolling of the limitations period.  He did not begin to seek state collateral review until three years and seven months after the limitations period began to run, and initiated this action 18 days after that review ended.  Petitioner must therefore establish either that he is entitled to equitable tolling for nearly four years after he abandoned his appeal, or a combination of equitable and statutory

tolling for those four years. Because he seeks equitable tolling for that entire period, which would render statutory tolling unnecessary, the Court will address equitable tolling first.

## B. Equitable Tolling

In order to be entitled to equitable tolling of the statute of limitations, Petitioner must show: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010). "[E]quitable tolling is unavailable in most cases." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999). "[T]he threshold necessary to trigger equitable tolling (under AEDPA) is very high, lest the exceptions swallow the rule." Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002). Petitioner bears the burden of showing "extraordinary circumstances" were the cause of his untimeliness, rather than merely a lack of diligence. Spitsyn v. Moore, 345 F.3d 796, 799 (9th Cir. 2003). The Court is required to ensure the record is sufficiently developed when a petitioner "makes 'a good faith allegation that would, if true, entitle him to equitable tolling.'" Roy v. Lampert, 465 F.3d 964, 969 (9th Cir. 2006), quoting Laws v. Lamarque, 351 F.3d 919, 919 (9th Cir. 2003). The Ninth Circuit has held:

> [W]e conclude that eligibility for equitable tolling due to mental impairment requires the petitioner to meet a two-part test:
>
> (1) *First*, a petitioner must show his mental impairment was an 'extraordinary circumstance' beyond his control by demonstrating the impairment was so severe that either
>
> (a) petitioner was unable rationally or factually to personally understand the need to timely file, or
>
> (b) petitioner's mental state rendered him unable to personally prepare a habeas petition and effectuate its filing.
>
> (2) *Second*, the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance.

Bills v. Clark, 628 F.3d 1092, 1099-1100 (9th Cir. 2010) (internal citation omitted).

As a starting point, the Court will look at the evidence presented at the evidentiary hearing on the motion to withdraw the plea and Petitioner's decision to abandon his appeal. Although those events occurred prior to the start of the statute of limitations, they are relevant because the abandonment of the appeal occurred the day before the limitations period began to run, when Petitioner seeks to begin equitable tolling, because the Court is required to consider the "totality of the circumstances" when determining if equitable tolling is available, id., and because Petitioner contends his "once stable condition fully deteriorated long before the period he seeks tolling and continued to restrain him during the entire period." (Pet.'s Opp. at 2.) As set forth in detail above, the trial judge and Petitioner's counsel both agreed Petitioner is an intelligent and articulate person. The record shows that during trial he engaged in plea negotiations with counsel, discussed the plea with his girlfriend, and received an "A" in a community college criminal law course. He accepted the plea after the first day of trial testimony, when he admitted he realized he was going to be convicted, and informed jail officials later that day he had accepted the plea offer and was no longer suicidal. Although Dr. Stein diagnosed him with borderline personality disorder, she said that under the proper circumstances someone with that disorder could knowingly and intelligently enter a plea, and the parties disagreed whether she was ultimately able to say with certainty that the plea was not knowing and voluntary, or merely that it was unclear whether he had recovered sufficiently from his weekend in isolation to be able to enter such a plea. The trial judge found the plea was knowing and voluntary, and none of the three attorneys who represented Petitioner ever indicated he was not competent to enter a plea, to be sentenced, or to abandon his appeal.

More significantly, there is no support in the trial record that Petitioner could not at that time understand the need to timely challenge his plea. Rather, the court minutes indicate that on the day originally set for sentencing: "Atty Cohen informs Court that defendant wishes to make his own motion to withdraw plea. Atty Cohen does not participate in this motion. The Court relieves Atty Cohen and appoints new counsel thru

17cv1805-MMA (NLS)

O.A.C."  (CT 422.)  The notice of abandonment of appeal states: "Pursuant to rule 8.316 of the California Rules of Court, I, Christian C. Buckley, attorney of record for appellant Marquise Deangelo Loftis in the above-entitled matter, hereby abandons this appeal on behalf of, *and at the request of*, Mr. Loftis and request that it be dismissed.  Mr. Loftis *informed me of his decision* on October 3, 2012."  (Lodgment No. 6) (emphasis added).  Thus, not only does the record indicate Petitioner personally and timely decided to withdraw his plea, it shows he personally and timely decided to abandon his appeal.

Respondent speculates Petitioner abandoned his appeal in order to avoid a longer sentence should the appeal succeed and the matter be remanded for trial, (MTD Mem. at 16-17), whereas, as set forth below, Petitioner contends it was an irrational decision arising from his mental impairment.  By timely abandoning his appeal, Petitioner avoided the possibility of losing the benefit of his plea bargain, which provided he was convicted of only five of the 17 charges against him, and sentenced to less than 23 years with a minimum of 18 years.  The dismissed counts included seven counts of assault with a firearm with exposure of 14 years on each count, and four counts of armed robbery with exposure of 25 years on each count.  (CT 182-89, 379.)  The record of the evidentiary hearing shows he was aware that he faced life in prison if convicted on all or most of the counts, and was aware that the evidence presented against him on the first day of trial was strong enough to convict him of carjacking, three counts of assault with a handgun, and three counts of armed robbery.

Accordingly, the events surrounding Petitioner's guilty plea, his timely decision to file a *pro se* motion to withdraw the plea, and his timely decision to abandon his appeal prior to the risk of losing the benefit of a generous plea bargain, do not support a conclusion that, at that time "his mental impairment was an 'extraordinary circumstance' beyond his control . . . so severe that . . . [he] was unable rationally or factually to personally understand the need to timely" seek relief, so as to warrant equitable tolling.  Bills, 628 F.3d at 1099-1100; see also United States v. Loyola-Dominguez, 125 F.3d 1315, 1319 (9th Cir. 1997) ("[Not] every suicide attempt inevitably creates a doubt concerning the defendant's

competency."); Davis v. Woodford, 384 F.3d 628, 645-46 (9th Cir. 2004) (defendant's decision not to wear civilian clothes during trial did not create a genuine doubt as to his competency).

Turning to the period which Petitioner seeks equitable tolling, from October 6, 2012, the day the statute of limitations began to run, until August 27, 2017, when this action was initiated, nearly five years, he needs equitable or statutory tolling for that entire period, less one year. See Grant v. Swarthout, 862 F.3d 914, 918 (9th Cir. 2017) ("If a prisoner can demonstrate that he is entitled to equitable tolling for a certain period of time, that period will be subtracted from the total number of days that have passed. If, after those days are subtracted, less than 365 days have passed, the prisoner's petition for habeas corpus will be accepted as timely.") He filed five *pro se* state court collateral review petitions challenging his guilty plea during the period he seeks equitable tolling. Even to the extent he initially incorrectly chose *coram nobis* rather than habeas corpus for relief in the first of those petitions, and *coram nobis* and *coram vobis* in the second, those would constitute legal errors, and are not something which shows he was "unable rationally or factually to personally understand the need to timely file," or that his "mental state rendered him unable to personally prepare a habeas petition and effectuate its filing." Bills, 628 F.3d at 1099-1100. His personal decisions to timely seek to withdraw his plea and timely abandon his appeal, and his filing of four *pro se* state collateral review petitions challenging his plea, on its face, falls short of surmounting the "very high" threshold necessary to show the existence of "extraordinary circumstances beyond a prisoner's control [which] make it impossible to file a petition on time." Miles, 187 F.3d at 1107; Miranda, 292 F.3d at 1066 ("[T]he threshold necessary to trigger equitable tolling (under AEDPA) is very high, lest the exceptions swallow the rule.")

Petitioner presents evidence in the form of medical records, school records and declarations, which he contends establish that beginning with his entrance into the prison system shortly after sentencing he was never competent to prepare and file his own petitions and had to rely on other inmates to prepare and file them for him. However, as

will be seen, Petitioner's own evidence demonstrates that beginning in late 2014, about three years before he initiated this action, he was seeking assistance from other inmates to challenge his plea, and by July 2015 he had access to such assistance which permitted him to file nearly a dozen different *pro se* pleadings in state and federal court, as well as timely pursue prison administrative remedies. The evidence establishes that, even if equitable tolling is available based on his mental condition, it would have ended over two years before he initiated this action on August 27, 2017. See Bills, 628 F.3d at 1099-1100 (holding that the mental impairment must have "made it impossible to meet the filing deadline under the totality of the circumstances, *including reasonably available access to assistance*.") (emphasis added); Spitsyn, 345 F.3d at 799 (holding that "extraordinary circumstances" must be the actual cause of the untimeliness).

The records before the Court in support and opposition to the motion to dismiss range from Petitioner's birth to the present. Petitioner presents school records showing that his mother reported "maternal and paternal family histories are significant for ADHD, depression, school learning behavior, and speech/language problems, and special education services. The paternal side family history also is significant for alcohol problems, emotional problems and mental hospitalization." (Pet. Ex. M.) She indicated that from his birth until five years of age he "was overactive, hyperactive, overly aggressive, hard to care for and hard to discipline," and although she reported a head injury, the records indicate that "no details regarding the head injury were available." (Id.) Petitioner was diagnosed with Attention Deficit Hyperactivity Disorder in May 1996, when he was five years old, and prescribed Ritalin. (Pet. Ex. K.) Ritalin was discontinued in November 1998, while he was in third grade, because it caused depression as a side effect. (Pet. Ex. L.) An October 6, 1998, report from a school psychologist, when he was in third grade, reported a history of frequent out-of-control behavior from kindergarten to the first part of second grade, and indicates that he was "identified with a Specific Learning Disability" as he entered third grade, where he was physically aggressive. (Pet. Ex. N.) An Individualized Education Program assessment in May 2000 states he was removed from the general

education campus and placed in a special school because he "has been unable to build or maintain satisfactory interpersonal relationships with peers, teachers, administrative, and other adults in the general education setting . . . extraordinary methods and specially trained instructors are required to meet his behavioral needs." (Pet. Ex. N.)

Petitioner's prison medical records show that when he entered the prison system on January 6, 2011, he informed prison officials he had been diagnosed with borderline personality disorder, was experiencing withdrawal from cocaine and PCP, heard voices and had suicidal thoughts. (Lodgment No. 16 at 210, 216.) He was interviewed and reported to be "cooperative, polite, good grooming, good eye contact, speech normal rate/vol., thoughts linear with normal rate and flow, no associations noted, no delusions identified, mood euthymic, affect congruent, denies SI/HI, denies AH/VH, I/J poor, cognition clear, speech spontaneous, not responding to internal stimuli, AIMS – negative." (Id. at 262.) The initial diagnosis by prison doctors on January 20, 2011, was paranoid schizophrenia with moderate functional impairment, and with symptoms which were moderate, mild and improving. (Id. at 240-45.) Upon entering the state prison system he informed doctors that he did not want to be medicated (id. at 262), but on February 1, 2011, he filed an inmate request indicating: "I need meds for my mood" (id. at 159), and was prescribed Geodon several days later, and Citalopram and Hydroxyzine a month later. (Id. at 185-211, 235, 262.) By June 2011, the diagnosis changed to adjustment disorder and borderline personality disorder, and it was again noted that he "was cooperative, he presented as alert, good hygiene, oriented x4, thought process was linear and logical, does not appear to be responding to internal stimuli, appetite is good (eating 3 meals), he denied SI, HI, AH, VH, PI, and depressive or anxiety symptoms." (Id. at 247-48.)

Petitioner presents documents showing he was placed in the prison's Enhanced Outpatient Program from May 2013 through June 2016. (Pet.'s Opp. at 27-51.) They show he was proscribed psychotropic medication shortly after he entered the program, but the psychotropic medication was discontinued in late 2014 or early 2015. (Id.) By 2017, he continued to receive treatment for "depression, major, recurrent," but was rated as being at

a low risk for suicide since he had not attempted suicide again after his initial attempt prior to his guilty plea, his thought process was linear, his attention, concentration and thought content were adequate, and he was a good candidate to be transferred to a lower level of care. (Lodgment No. 16 at 87-89, 112-14.) In late 2017 he was taking medication for depression "related to being in prison and/or environmental factors," but reported the medication helped and had no side effects, and he indicated that he was "getting ready to be discharged from [the Enhanced Outpatient Program]." (Id. at 93-95, 118.)

Respondent argues the records show that Petitioner's worst period was when he entered his plea, a time when his own expert said his condition was transitory, and points out that his counsel on the motion to withdraw the plea did not express any doubt as to his ability to be sentenced. (MTD Mem. at 14-17.) Respondent also argues the record is sufficiently developed to make a determination regarding equitable tolling, and it fails to demonstrate a mental or medical condition sufficiently severe as required to show under Bills it was not possible for Petitioner to meet the filing deadline for his federal Petition. (Id., citing Roberts v. Marshall, 627 F.3d 768, 772-73 (9th Cir. 2010) (holding that district court did not abuse its discretion in declining to hold evidentiary hearing on equitable tolling where it had access to extensive medical records which indicated petitioner's "relevant mental functions were either 'good' or 'within normal limits,'" and where he "managed to file several petitions for post-conviction relief in state court during the time" he was seeking equitable tolling), citing Laws, 351 F.3d at 924 ("Of course, a petitioner's statement, even if sworn, need not convince a court that equitable tolling is justified should countervailing evidence be introduced."))

Petitioner argues that despite the fact that his medical records report his thinking as logical and linear, his paranoid schizophrenia, as diagnosed by prison doctors, has caused him to lose touch with reality and prevented him from understanding the need to timely file court documents. (Pet.'s Opp. at 18.) He argues that his "once stable condition fully deteriorated long before the period he seeks tolling and continued to restrain him during the entire period." (Id. at 2.) He contends that while his "appeal was pending [from January

7, 2011 to October 5, 2012] he fell into a severe psychosis that caused him to believe his appellate attorney was a state spy planted to sabotage Loftis, which led to the irrational abandonment of his appeal." (Id. at 3.)  Finally, he argues that his placement in the Enhanced Outreach Program for approximately six years shows that the prison medical professionals believed he was severely mentally impaired. (Id. at 11, 17-19.)

Petitioner presents several declarations as evidence he was not competent to prepare and file his own court pleadings.  He states in his own declaration that he started to "fall apart mentally and physically" almost immediately upon arrival into the prison system, where he was housed at the R. J. Donovan Correctional Facility in San Diego during his first eleven months, and where "the majority of the time [he] was in 24 hour cell confinement." (Id. at 52.)  During that time he was given medication which "helped with the voices and sleep, but I was always tired, . . . and I slept a lot.  I was on these medications for a few years, then I took others that had the same effect or worse." (Id. at 52-53.)  He was then transferred to the California State Prison-Sacramento, where a riot caused him to witness inmates being shot, stabbed and beaten, which resulted in a lockdown, during which he began hallucinating. (Id. at 53.)  He began losing sleep during the second year of incarceration because he thought his cellmate and the correctional officers were trying to kill him. (Id.)

Petitioner states that in mid-2012, he was transferred to the California State Prison-Los Angeles and placed in the Enhanced Outpatient Program, but had "the same thoughts and feelings because of my mental illness, and they caused me to make bad decisions, like dropping my appeal and getting into trouble." (Id.)  He informed his counsel on October 3, 2012, that he wished to abandon his appeal. (Lodgment No. 6.)  He states that: "If I hadn't had a mental crash I would not have dropped my appeal, because I wanted to go home." (Pet.'s Opp. at 53.)  "In late 2012 or early 2013, my cellmate Lionel Tholmer tried to teach me what I needed to know to file a[n] appeal, but I could not understand what I was reading, because I couldn't concentrate, my thoughts were scattered, and I easily got tired after trying to read – my mental impairments kept control over me." (Id. at 53-54.)

He states that Inmate Tholmer agreed to file his appeal "but was helping so many people he did not get to me [before] I was sent back to [R. J. Donovan in San Diego] in early 2013." (Id. at 54.) Petitioner states: "No help for post-conviction relief was available at [R. J. Donovan] until around June 2014, when my cellmate Gennaire Harris sought help from his friend Dave for me, but the help consisted of trying to teach me law, which was impossible because of my impairments." (Id.) In late 2014, he paid an inmate to file an appeal, but the inmate took his money and did not file anything. (Id.)

Petitioner states that: "Available assistance did not come until summer 2015, when Tholmer was transferred to [R. J. Donovan] and became my cellmate." (Id.) He says that Tholmer "took complete control of what needed to be done for my post-conviction relief, and filed the petition for writ of coram nobis in the state superior court and appealed the denial to the state appellate court, then filed my state writ of habeas corpus in the California Supreme Court." (Id.) After those petitions were "denied for pleading deficiencies," and while the first state supreme court habeas petition was pending, Petitioner was transferred back to Los Angeles, where: "I now had access to a lot of assistance, because of Tholmer researching and writing the first state petitions, I was now able to articulate my claims by showing other inmates his work then they could help me. With Tholmer's work I was able to secure help from inmate Derrick Oden, who filed my second habeas corpus in the California Supreme Court, and then prepared my federal habeas corpus." (Id. at 54-55.) Accordingly, Petitioner's declaration indicates that he began seeking assistance from other inmates shortly after he abandoned his appeal on October 5, 2012, when the statute of limitations began to run, and although he at first encountered obstacles, he obtained the assistance necessary to collaterally challenge his plea in the summer of 2015, more than two years before he initiated this action on August 27, 2017.

Petitioner presents the declaration of Marissa Loftis, who states that she has been his wife since June 21, 2014, that when she first met him in 2006 he was very socially awkward and depressed, and before his arrest in 2009 he was child-like, wanted to fit in with his friends, and was easily manipulated. (Id. at 56-57.) She helped him with his community

17cv1805-MMA (NLS)

college school work while he struggled with mental illness, and during his incarceration he told her the correctional staff, his lawyer, the judge and the prosecutor were plotting against him, which she later realized were delusions.  (Id. at 57-58.)  He had mood swings and was paranoid during their visits in 2012 and 2013.  (Id. at 59.)  Finally, she states that when he abandoned his appeal he "didn't even seem like it was a big deal and claimed it was due to the people involved in his case setting him up."  (Id. at 59-60.)

Petitioner presents a declaration from Michael Kinley, his cellmate in 2012 in Los Angeles, who states that he witnessed Petitioner "suffering from mental illness so bad that he had trouble completing his daily chores," was paranoid, and "expressed crazy beliefs that he was a political prisoner."  (Id. at 61-62.)  Kinley states that Petitioner wanted to fire his attorney, so Kinley introduced him to a jailhouse lawyer, inmate Lionel Tholmer.  (Id. at 62.)  When Petitioner was transferred back to Los Angeles in late 2016 (id. at 54), Kinley said: "I believe he [was] a lot better than last time we were together."  (Id. at 62.)

Lionel Tholmer states in his declaration that in 2012 he was incarcerated with Petitioner in Los Angeles, where Petitioner "frequently had trouble" with cellmates and correctional staff, believed his appellate attorney was colluding with the trial judge and other state workers to keep him in prison, and, in Tholmer's opinion, would not have abandoned his appeal but for his mental illness.  (Id. at 63-64.)  When Tholmer advised Petitioner not to abandon his appeal, Petitioner accused him of working with the state against him.  (Id. at 64.)  He states that while they were cellmates in Los Angeles: "I was exposed to external symptoms of what I believe were psychosis.  These included, but not limited to, believing his family had a special connection to President Obama and writing coded messages to President Obama multiple times to secure his freedom; hallucinations; extreme paranoia; irrational thinking; verbal outburst; and mixing his own beliefs up with what was actually real."  (Id.)  Tholmer was transferred to R. J. Donovan in July 2015, where Petitioner was confined at the time, and states that he "immediately began fighting on Loftis's behalf . . . by filing several state habeas corpus actions regarding prison conditions, and investigating post-conviction relief claims for him."  (Id. at 65.)  Tholmer

states that he conducted the necessary investigation through which he obtained the school records Petitioner has presented here and to the state court, which Tholmer indicates were necessary to prepare Petitioner's state collateral review petitions, and that in his opinion Petitioner could not have prepared those petitions without help. (Id. at 65-66.)

A declaration from inmate Gennaire Harris describes Petitioner's behavior while they were incarcerated together in 2013, and states "the entire time I was incarcerated with Loftis, he would not have been able to properly communicate with a jailhouse lawyer to assist him with filing a petition." (Id. at 68-71.) A declaration from inmate David Saxton describes efforts he made to teach Petitioner how to collaterally challenge his conviction in late 2013 through mid-2014. (Id. at 73-90.) Finally, Ciron Springfield states in his declaration that he met Petitioner in the law library in 2017, and researched and filed the opposition to this motion to dismiss because Petitioner is "mentally slow and had no understanding of law or its application, or how to prepare a motion." (Id. at 91-92.)

As set forth above, in order to be entitled to equitable tolling, Petitioner must not only show that his "mental state rendered him unable to personally prepare a habeas petition and effectuate its filing," which he fails to show through his medical and school records but attempts to establish through his declarations, he must also "show that the mental impairment made it impossible to meet the filing deadline *under the totality of the circumstances, including reasonably available access to assistance*." Bills, 628 F.3d at 1099-1100 (emphasis added). "The mental impairment must be so debilitating that it is the but for cause of the delay, and even in cases of debilitating impairment the petitioner must still demonstrate diligence." Yow Ming Yeh v. Martel, 751 F.3d 1075, 1078 (9th Cir. 2014). A determination "whether there are grounds for equitable tolling [is] highly fact-dependent." Whalem/Hunt v. Early, 233 F.3d 1146, 1148 (9th Cir. 2000) (en banc).

The records presented do not support a finding that Petitioner suffered from a mental impairment so debilitating that it "rendered him unable to personally prepare a habeas petition and effectuate its filing," or "unable rationally or factually to personally understand the need to timely file [a federal habeas action]." Bills, 628 F.3d at 1100. Rather, they

indicate Petitioner suffers from depression and has been diagnosed with borderline personality disorder, adjustment disorder, and paranoid schizophrenia, with only moderate impairments reported, and a linear and logical thought process.

Even accepting the factual allegations in the declarations as true, they establish Petitioner was seeking "access to assistance" from other inmates as far back as late 2012, about five years before he filed his federal habeas Petition. The declarations also establish that by at least July 2015, his medical or mental condition did not prevent him from accepting inmate Tholmer's assistance in pursuing state collateral relief, and thereafter had the ability, with the assistance of other inmates, to seek federal habeas relief. (Pet.'s Opp. at 54, 65.) As Respondent points out (MTD Mem. at 16), Petitioner's mental condition did not prevent him from filing and settling three *pro se* civil rights actions in this Court challenging conditions of his confinement, which provide further support for Petitioner's statement that after inmate Tholmer began assisting him in July 2015, he was able, with assistance of other inmates, to prepare and timely file state and federal court pleadings.[5] (See Pet.'s Opp. at 17.)

_____

[5] This Court's record shows Petitioner was able to prepare, file and settle three *pro se* civil rights actions in this Court, which included the timely exhaustion of prison administrative remedies and three underlying state habeas petitions. These include: (1) a *pro se* civil rights complaint which alleged a First Amendment violation for failure to accommodate his religious need for a special diet, presumptively constructively filed on August 15, 2016 and settled on December 22, 2017. (See So.Dist.Ca.Civil Case No. 16cv2094-BTM (KSC), ECF Nos. 1, 19.) In that case, Petitioner indicated he timely sought relief through the prison administrative appeal system beginning on December 28, 2015. (Id., ECF No. 1 at 6, 9); (2) a *pro se* civil rights complaint which was presumptively constructively filed on July 28, 2016 and settled on December 12, 2017, which alleged Petitioner was placed in administrative segregation in retaliation for submitting a July 15, 2015 inmate grievance. (See So.Dist.Ca.Civil Case No. 16cv2093-AJB (RBB), ECF Nos. 1, 20.) In that case he indicated he timely sought relief through the prison administrative appeal system beginning on August 11, 2013. (Id., ECF No. 1 at 6, 20); and (3) a *pro se* civil rights complaint presumptively constructively filed on June 16, 2016 and settled on December 12, 2017, which alleged a denial of his right to appeal a disciplinary action by the refusal to process a December 14, 2014 inmate grievance. (See So.Dist.Ca.Civil Case No. 16cv1593-MMA (WVG), ECF Nos. 1, 29.) He indicated in that case that he sought habeas relief in the state

"The Court should examine whether the petitioner's mental impairment prevented him from locating assistance . . . the existence of such help would be highly relevant to the question of whether a petitioner's mental condition made it impossible to file a timely petition." <u>Id.</u> Accepting the statements in the declarations filed by Petitioner as accurate and credible, they provide, at best, for equitable tolling until July 2015, when he was able to seek out and take advantage of assistance of other inmates irrespective of his mental impairment. With that assistance he pursued nearly a dozen *pro se* actions, and the delay in seeking federal habeas relief was not caused by any extraordinary circumstances. <u>See Chaffer v. Prosper</u>, 592 F.3d 1046, 1049 (9th Cir. 2010) (finding that "reliance on helpers who were transferred or too busy to attend to his petitions . . . are hardly extraordinary [circumstances] given the vicissitudes of prison life, and there is no indication in the record that they made it 'impossible' for him to file on time.") Rather, the record demonstrates that after July 2015, Petitioner understood the need for assistance, was able to secure such assistance in the process of exhausting his federal claims in anticipation of filing his federal petition, and was able to cooperate and monitor that assistance. Ninth Circuit authority precludes equitable tolling after that time because, rather than file a federal habeas petition when he was able in July 2015, he waited over two years to do so while he filed nearly a dozen other *pro se* petitions and complaints instead. He fails to demonstrate that his mental impairment caused him to miss the federal deadline, and there is no indication in the medical records that his mental impairment prevented him from understanding the need to timely file a federal habeas petition. His declarations show he procured assistance for a

_____

superior, appellate and supreme courts before filing his federal complaint, and attached a copy of a state supreme court *pro se* habeas petition, dated November 12, 2015, which indicates that the appellate court habeas petition was denied on September 30, 2015. (<u>Id.</u> ECF No. 1 at 29-30.) With those three civil rights cases, one of which had three state habeas exhaustion petitions, plus the four state collateral review petitions filed in this case, and the instant Petition, the record shows Petitioner was able to initiate at least 11 *pro se* state and federal court petitions and complaints since he began receiving assistance in July 2015, in addition to filing prison administrative appeals prior to that time.

wide range of legal issues, and utilized that assistance to procure additional assistance to collaterally challenge his guilty plea in state court while at the same time timely exhausting prison administrative remedies as a prerequisite to litigating claims alleging a failure to accommodate his religious diet, retaliation for filing prison grievances, and denial of his right to pursue prison grievances. See Bills, 628 F.3d at 1100 ("The 'totality of the circumstances' inquiry in the second prong considers whether the petitioner's impairment was a but-for cause of any delay. Thus, a petitioner's mental impairment might justify equitable tolling if it interferes with the ability to understand the need for assistance, the ability to secure it, or the ability to cooperate with or monitor assistance the petitioner does secure."); Yow Ming Yeh, 751 F.3d at 1078 (holding that facts showing petitioner "repeatedly sought administrative and judicial remedies, . . . was able to make requests for assistance . . . [and] was able to file a state habeas petition in three different California venues . . . refute a claim of impairment so debilitating that one could not 'rationally or factually' understand the meaning of a deadline."), quoting Bills, 628 F.3d at 1099-1100; see also Spitsyn, 345 F.3d at 799 (noting that the burden is on petitioner to show the "extraordinary circumstances" caused his untimeliness under a "fact-specific inquiry"); Laws, 351 F.3d at 922-23 (stating that equitable tolling is available only where mental impairment somehow made filing a timely habeas petition impossible). The totality of the circumstances do not support a finding that his mental impairment prevented him from understanding the need to timely file a federal habeas petition, or was the proximate cause of his delay in filing a federal habeas petition once he had secured assistance.

There is also no basis to find that although Petitioner was able to file state habeas petitions in order to exhaust state court remedies prior to filing his federal habeas Petition, he is entitled to equitable tolling during the exhaustion process simply because he was not able to file a federal petition until he successfully exhausted state court remedies. See Pace v. DiGuglielmo, 544 U.S. 408, 416 (2005) (observing that a state prisoner concerned that his attempts to exhaust federal habeas claims in state court might discover only at the end that his state petitions did not toll the statute of limitations because they were procedurally

deficient under state law, can file a "protective" habeas petition in federal court and request "the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted.") There is no indication that procedure was unavailable. See id. ("A petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file in federal court."), citing Rhines v. Weber, 544 U.S. 269, 278 (2005) (holding that if a petitioner had good cause for failing to exhaust, his unexhausted claims are potentially meritorious, and did not engage in intentionally dilatory tactics, "it would likely be an abuse of discretion for a district court to deny a stay and dismiss" a mixed petition.); Mena v. Long, 813 F.3d 907, 912 (9th Cir. 2016) (holding that Rhines applies to fully unexhausted petitions).

In sum, if Petitioner receives the benefit of equitable tolling from October 6, 2012, when the limitations period began to run, and ending at the latest on July 31, 2015, when he had assistance in pursuing state collateral review in this case, he had one year from August 1, 2015 in which to timely file his federal habeas Petition. He initiated this action on August 27, 2017, a delay of more than two years. Assuming the one-year statute of limitations began to run on August 1, 2015, he allowed 279 days to expire before it could have begun being statutorily tolled when he began one complete round of state collateral review when he filed his first *coram nobis* petition on May 6, 2016. Thus, 86 days would have remained on the limitations period at the beginning of any possible statutory tolling. As discussed below, his one complete round of state collateral review ended when his second and final state habeas petition was denied on August 9, 2017, 18 days before he initiated this action on August 27, 2017. Assuming he is entitled to equitable tolling beginning soon after he was incarcerated and continuing until he secured assistance from other inmates sufficient to prepare and file court pleadings, and assuming he is entitled to statutory tolling for the entire period he was seeking state collateral review, his federal Petition would have been filed 68 days (86-18=68) before expiration of the statute of limitations. See Grant, 862 F.3d at 918 ("If a prisoner can demonstrate that he is entitled to equitable tolling for a certain period of time, that period will be subtracted from the total

number of days that have passed.  If, after those days are subtracted, less than 365 days have passed, the prisoner's petition for habeas corpus will be accepted as timely.") Accordingly, even with the most generous equitable tolling available, he must still show he is entitled to statutory tolling arising from his state collateral review petitions.

### C.  Statutory Tolling

The statute of limitations is tolled while a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending" in state court.  28 U.S.C. § 2244(d)(2).  If Petitioner was "properly pursuing" his state court remedies, "the one-year statute of limitations is tolled from the time the first state habeas petition is filed until the California Supreme Court rejects the petitioner's final collateral challenge."  Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir. 1999), overruled in part by Carey v. Saffold, 536 U.S. 214, 225 (2002) (holding that the statute of limitations is not statutorily tolled during gaps between state petitions if the delay is "unreasonable" under California law).  If the limitations period had expired when Petitioner began seeking state collateral review, statutory tolling is not available for any state petition.  Jiminez v. Rice, 276 F.3d 478, 482 (9th Cir. 2001) (holding that state post-conviction petitions filed after expiration of the limitations period are ineligible for statutory tolling).

Petitioner began seeking collateral review when he presumptively constructively filed his first *pro se coram nobis* petition in the superior court on May 6, 2016, three years and seven months after the limitations period began to run on October 6, 2012.  (Lodgment No. 8.)  His final state collateral review petition was denied on August 9, 2017, 18 days before he initiated this action.  (Lodgment No. 15.)  In order for his state collateral review petitions to have been filed prior to expiration of the federal statute of limitations, he needs equitable tolling for at least two years and seven months beginning on October 6, 2012. As set forth above, the longest amount of equitable tolling available would have ended on July 31, 2015, and the one-year statute of limitations ran for 279 days before it would have been stopped on May 6, 2016 with the filing of the first state collateral review petition. Thus, accepting the facts as alleged by Petitioner as true, and assuming equitable tolling is

available through July 31, 2015, he began seeking state collateral review of his guilty plea with 86 days remaining on the one-year limitations period. Under that scenario, his state collateral review petitions would be *eligible* to statutorily toll the limitations period.

The first of his state collateral review petitions was presumptively constructively filed in the superior court on May 6, 2016, a *pro se* petition titled: "Notice of Motion and Motion to Vacate Judgment (Petition for Writ of <u>Error</u> <u>Coram</u> <u>Nobis</u>.)" (Lodgment No. 8.) Petitioner alleged he was incompetent to enter a plea and that his trial counsel was ineffective in failing to investigate his mental state, and only became aware of those claims when he obtained his school records "after trial while assigned to mental health evaluation in the prison." (<u>Id.</u> at 10, 12.) The court denied the petition on the basis that Petitioner had not identified an unknown fact that would have prevented entry of judgment as required to warrant *coram nobis* relief, that his medical and school records did not demonstrate he was legally insane which would have prevented rendition of judgment so as to support *coram nobis* relief, and that state law provides that a petition for writ of habeas corpus, not *coram nobis*, is the proper avenue for a claim of ineffective assistance of counsel. (Lodgment No. 9, <u>People v. Loftis</u>, No. SCE 292832, order at 2-3 (Cal.Sup.Ct. May 20, 2016), quoting <u>People v. Soriano</u>, 194 Cal.App.3d 1470, 1474 (1987) ("A writ of *coram nobis* permits the court which rendered judgment to 'reconsider it and give relief from errors of fact.' The writ will properly issue only when the petitioner can establish three elements: (1) that some fact existed which, without his fault or negligence, was not presented to the court at the trial and which would have prevented the rendition of the judgment; (2) that the new evidence does not go to the merits of the issues of fact determined at trial; and (3) that he did not know nor could he have, with due diligence, discovered the facts upon which he relies any sooner than the point at which he petitions for the writ."))

Petitioner presumptively constructively filed a similar *pro se* petition in the appellate court on June 12, 2016, a 23-day gap between the denial by the lower court and the filing in the appellate court, but added to the title "<u>coram</u>//<u>vobis</u>, and supporting verification." (Lodgment No. 10.) It was denied 9 days later, on June 21, 2016, with an order which

stated: "The 'notice of motion and motion to vacate judgment (petition for writ of error coram nobis//coram vobis()), and supporting verification' has been read and considered by Justices Benke, Nares, and Irion. The filing is treated as a petition for writ of error *coram nobis*. The petition is denied." (Lodgment No. 11, <u>People v. Loftis</u>, No. D070508, order at 1 (Cal.App.Ct. June 21, 2016).) Because there is no indication to the contrary, the Court presumes the appellate court denied the *coram nobis* petition on the same basis it was denied by the superior court. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-06 (1991).

Both of those petitions would, if they were filed prior to expiration of the one-year federal statute of limitations, and if they were timely under state law, provide statutory tolling because there is no indication they were "lodged in the wrong court or office, or formatted improperly." <u>Gaston v. Palmer</u>, 417 F.3d 1030, 1039 (9th Cir. 2005), citing <u>Artuz v. Bennett</u>, 531 U.S. 4, 8-9 (2000) ("the question whether an application has been 'properly filed' is quite separate from the question whether the claims *contained in the application* are meritorious and free of procedural bar.") However, if they were untimely under state law, they would not statutorily toll the limitations period. <u>See Pace</u>, 544 U.S. at 417 (holding that petitions which are untimely under state law are not "properly filed" and do not support statutory tolling).

Neither the state superior or appellate court discussed or mentioned the timeliness of those petitions, other than the superior court noting that an application for *coram nobis* relief is improper unless Petitioner can establish "that he did not know nor could he have, with due diligence, discovered the facts upon which he relies any sooner than the point at which he petitions for the writ." (Lodgment No. 9, <u>People v. Loftis</u>, No. SCE 292832, order at 2, quoting <u>Soriano</u>, 194 Cal.App.3d at 1474). In the absence of any clear indication a particular state petition was timely, a federal court "must itself examine the delay in each case and determine what the state courts would have held in respect to timeliness." <u>Evans v. Chavis</u>, 546 U.S. 189, 198 (2006). There is no need to determine if the first two petitions were timely under state law because, even giving Petitioner the benefit of statutory tolling

for the 47 days they were pending, including the gap between them, he still requires an additional 346 days (393-47=346) of statutory tolling. <u>Grant</u>, 862 F.3d at 918.

Rather than continuing seeking *coram nobis* relief, Petitioner next presumptively constructively filed a *pro se* habeas petition in the state supreme court on August 3, 2016, a gap of 17 days between the denial by the appellate court and the filing in the supreme court. (Lodgment No. 12.) That petition was denied 69 days later, on October 12, 2016, with a citation to <u>Duvall</u>, 9 Cal.4th at 474. (Lodgment No. 13.) A citation to page 474 of the <u>Duvall</u> opinion "may mean 'the available state remedies have not been exhausted as the California Supreme Court has not been given the required fair opportunity to correct the constitutional violation.'" <u>Medley v. Runnels</u>, 506 F.3d 857, 869 (9th Cir. 2007) (en banc) (Opinion of Ikuta, Circuit Judge, dissenting), quoting <u>Harris v. Superior Court</u>, 500 F.2d 1124, 1128 (9th Cir. 1974); <u>see also</u> <u>Pombrio v. Hense</u>, 631 F.Supp.2d 1247, 1251-52 (C.D. Cal. 2009) (noting that a <u>Duvall</u> citation points to a correctable defect and therefore does not support exhaustion). The Ninth Circuit has indicated that a citation to <u>Duvall</u> may be an indication the claims were not pled with sufficient particularity, and is therefore in the nature of a demurrer, which does not prevent a finding that the petition was "properly filed" so as to support statutory tolling. <u>Gaston</u>, 417 F.3d at 1039, citing <u>Artuz</u>, 531 U.S. at 9. Thus, if that state habeas petition was filed prior to expiration of the federal limitations period, and if it was timely under state law, statutory tolling could be appropriate while it was pending. In addition, if that habeas petition was a continuation of Petitioner's one full round of state collateral review, statutory tolling could be available for the entire time he was proceeding with that full round of state post-conviction relief, including the 17-day gap between the denial of appellate court *coram nobis* relief and the filing of the habeas petition. <u>Nino</u>, 183 F.3d at 1006. With the benefit of tolling for that entire round of state collateral review up to the denial of that first state habeas petition, a period of 160 days, he still requires 233 days (393-160=233) of statutory tolling.

Finally, on February 8, 2017, Petitioner presumptively constructively filed a second *pro se* habeas petition in the state supreme court, which is nearly identical to the Petition

filed here, a gap of 118 days where nothing was pending from when the first state supreme court habeas petition was denied until the second was filed. (Lodgment No. 14.) The second state habeas petition was pending for 183 days before it was denied on August 9, 2017, in an order which stated: "Petition for writ of habeas corpus denied." (Lodgment No. 15.) If that second state habeas petition began a new round of state collateral review, the 118-day gap between habeas petitions would be categorically ineligible to support statutory tolling. Biggs v. Duncan, 339 F.3d 1045, 1048 (9th Cir. 2003). The limitations period would have expired 86 days after the first state habeas petition was denied, during the 118-day gap while there was no state collateral review petition pending. However, if that second state supreme court habeas petition was "limited to an elaboration of the facts relating to the claims in the first petition," that is, if it "simply attempted to correct the deficiencies" in the prior petition, which it purported to do (see Lodgment No. 14 at 9), and which the citation to Duvall seems to suggest was necessary for proper exhaustion of state court remedies, it would be considered part of the first complete round of post-conviction relief. King v. Roe, 340 F.3d 821, 823 (9th Cir. 2003), overruled on other grounds by Chavis, 546 U.S. at 197. In that case the limitations period would be statutorily tolled while the two state supreme court habeas petitions were pending, provided they were both timely filed under state law. Pace, 544 U.S. at 414. It would also be statutorily tolled during the gap between them, provided the 118-day gap, or nearly four months, did not constitute an unreasonable delay under state law. Saffold, 536 U.S. at 222-26 (holding that the statute of limitations is not statutorily tolled during gaps between petitions if the delay is "unreasonable" under California law, that a reasonable delay under California law does not differ significantly from other states which allow 30 to 45 days between filings, and that statutory tolling would not apply to an unjustified four and one-half month gap).

Unlike the gaps between his first three state petitions of 23 and 17 days respectively, the 118-day gap between the denial of the first state habeas petition and the filing of the second is too long to support tolling unless it was properly justified under state law. Id.; see also Chaffer, 592 F.3d at 1048 (rejecting statutory tolling for unjustified gaps of 101

and 115 days), citing In re Swain, 34 Cal.2d 300, 302-03 (1949) (holding that a petitioner who did not appeal, did not request a trial on the issue of his sanity, and had several prior collateral challenges denied, must justify a delay in seeking collateral review); see also Banjo v. Ayers, 614 F.3d 964, 970 (9th Cir. 2010) (rejecting statutory tolling for unjustified gap of 146 days); Velasquez v. Kirkland, 639 F.3d 964, 968 (9th Cir. 2011) (same for gap of 81 days, and recognizing that district courts in the Ninth Circuit have rejected statutory tolling for gaps of 93 days and 97 days). Petitioner must show his two state habeas petitions were timely under state law, and must show adequate justification for the 118-day gap.

As set forth above, Petitioner explained to the state superior court that his delay in seeking *coram nobis* relief was due to the fact that he only came into possession of his school records when he began receiving mental health services in prison, and argued that if he or his trial counsel had been aware of those records before trial they would have triggered competency proceedings. (Lodgment No. 8 at 10.) He cannot rely on that excuse to justify his 118-day gap between state habeas petitions. See Saffold, 536 U.S. at 226 (holding that "the delay between the date his conviction became final and the date he first sought state postconviction relief [is] a matter irrelevant to the question whether his application was 'pending' during the four and one-half month interval [between filings].") In any case, he proffered a different excuse when attempting to justify in the state court the delay in seeking habeas relief, including the 118-day gap between state habeas petitions. He alleged, as he does here, that his mental illness prevented him from preparing legal pleadings on his own and he had to rely on other inmates for assistance, which he also gave as the reason for the 17-day gap between the denial of his *coram nobis* petition by the appellate court and the filing of his first state habeas petition. (Lodgment No. 12 at 6; Lodgment No. 14 at 25.) That explanation, provided to the state supreme court on August 3, 2016 and February 8, 2017 respectively (id.), was provided in the midst of the nearly one dozen *pro se* state and federal petitions and complaints he filed in 2015 and 2016 with the assistance of other inmates. (See footnote 4, *supra*.) Thus, the record does not show his mental condition or his need to rely on other inmates for assistance prevented him from

timely seeking state habeas relief. Rather, it shows that on February 8, 2017, at which time at least nine of his *pro se* state and federal actions had already been filed (id.), he presented to the California Supreme Court a habeas petition which for the first and only time fully-exhausted state court remedies as to the federal claims presented here.

Neither has he shown that the same excuse which caused a 17-day gap between the denial by the appellate court and the filing of the first supreme court petition could render the 118-day gap between the filings of the two state supreme court petitions reasonable under state law. He states in his declaration that inmate Tholmer prepared and filed the first state habeas petition, and while it was pending Petitioner was transferred to Los Angeles, where he was incarcerated when that petition was denied. (Pet.'s Opp. at 54.) He states that while incarcerated in Los Angeles: "I now had access to a lot of assistance, because of Tholmer researching and writing the first state petitions, I was now able to articulate my claims by showing other inmates his work then they could help me. With Tholmer's work I was able to secure help from inmate Derrick Oden, who filed my second habeas corpus in the California Supreme Court." (Id. at 54-55.) By his own admission the transfer took place before the first state habeas petition was denied, and when it was denied he had sufficient assistance at the new prison to file the second state habeas petition.

Because Petitioner was clearly able to seek state habeas relief with the assistance of other inmates during the 118-day gap, about four months, between state habeas petitions, the excuse he proffered to the state habeas courts for that delay, that he was not able to timely do so due to his mental condition, precludes a finding that they delay was reasonable under state law, and statutory tolling is not available during that gap. Saffold, 536 U.S. at 225-26 (observing that statutory tolling would not apply if a four and one-half month gap between state habeas petitions was unreasonable under California law). Thus, even with statutory tolling from May 6, 2016, when state collateral review began, at which time 86 days remained on the federal one-year statute of limitations, until October 12, 2016, when the first state habeas petition was denied, the statute of limitations expired 86 days later, during the 118-day gap between state habeas petitions.

Furthermore, even if Petitioner could justify the 118-day gap under state law, unless he can show that both of his state habeas petitions were timely under state law he is not entitled to statutory tolling while they were pending or for the gap between them. See Pace, 544 U.S. at 414 ("What we intimated in Saffold we now hold: When a postconviction petition is untimely under state law, 'that (is) the end of the matter' for purposes of' statutory tolling.)  The California Supreme Court order which denied the second habeas petition is silent as to the reason for the denial, and the first habeas petition was denied by that court with a citation to Duvall, which, as set forth above, suggests the claims were presented in a manner which failed to exhaust state court remedies for federal habeas purposes.  Thus, neither provides an indication of timeliness as to the six-year delay from entering his guilty plea on May 10, 2010, to first seeking state collateral review of his plea on May 6, 2016, or the nearly seven-year delay in finally presenting his claims in a manner which exhausted state court remedies on February 8, 2017.  See Chavis, 546 U.S. at 197 ("the fact that the California Supreme Court did not include the words 'on the merits' in its order denying Chavis relief makes it *less* likely, not *more* likely, that the California Supreme Court believed that Chavis' 3-year delay was reasonable.")

In the absence of any clear indication a particular state petition was timely, a federal court "must itself examine the delay in each case and determine what the state courts would have held in respect to timeliness." Id. at 198.  If the facts upon which Petitioner sought habeas relief in the state court were known to him at the time he entered his plea, both of his state habeas petitions are clearly untimely under state law. See Walker v. Martin, 562 U.S. 307, 312-21 (2011) (holding that California's timeliness rule requiring that a petitioner must seek relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied); In re Clark, 5 Cal.4th 750, 797-98 (1993) ("the general rule is still that, absent justification for the failure to present all known claims in a single, timely petition for writ of habeas corpus, successive and/or untimely petitions will be summarily denied.")

Petitioner contended in his state *coram nobis* petition that he did not become aware of his claims (that he was not competent to enter a plea and that his trial counsel could have proven it if he had investigated his mental health history), until he came into possession of his own school records sometime after he entered the prison system in 2010, and prior to filing his first petition for state collateral review on May 6, 2016. (See Lodgment No. 8 at 10.) The declaration of inmate Tholmer states he obtained those records in the course of assisting Petitioner in investigating his claims beginning in July 2015. (Pet.'s Opp. at 65.) The superior court found those records did not support the claims. (Lodgment No. 9, People v. Loftis, No. SCE 292832, order at 3.) He presented those same records in support of his state habeas petitions. (Compare Lodgment No. 8 [ECF No. 12-15 at 31-95] with Lodgment No. 12 [ECF No. 12-19 at 31-86] and Lodgment No. 14 [ECF No. 12-21 at 86-129].) The justification he provided for failing to timely seek state habeas relief is different from that given in the first *coram nobis* petition, and is identical to his argument here for equitable tolling, that he lacks the ability to draft pleadings due to his mental illness and is at the mercy of fellow inmates to draft pleadings for him. (Lodgment No. 12 [ECF No. 12-19 at 6]; Lodgment No. 14 [ECF No. 12-21 at 25].)

Even assuming Petitioner adequately justified his delay in seeking *coram nobis* relief because he did so soon after he came into possession of his own school records sometime between July 2015 and May 2016, the justification he provided for seeking habeas relief in October 2016 and February 2017 does not support a finding his state habeas petitions were timely under state law. See In re Robbins, 18 Cal.4th 770, 780 (1998) ("Substantial delay is measured from the time the petitioner or his or her counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim. . . . A petitioner bears the burden of *establishing*, through his or her specific allegations, which may be supported by any relevant exhibits, the absence of substantial delay.") As set forth above, there is no support for his contention that by February 8, 2017, when he filed his second state habeas petition, around a year or more after he states he discovered the facts upon which he sought relief, when he had already filed at least six *pro*

*se* petitions in state court, that he had established the absence of a substantial delay. Accordingly, the second state habeas petition was clearly not timely filed under California law, which precludes statutory tolling while it was pending or during the four-month gap between the two state habeas petitions.

**D.    Tolling Summary**

The one-year federal statute of limitations began to run on October 6, 2012. Petitioner waited three years and seven months before seeking state collateral review on May 6, 2016.   Although Petitioner does not establish an entitlement to equitable tolling based on his medical records alone, assuming it is available based on the declarations he has submitted, it would have ended, at the latest, on July 31, 2015.   Absent statutory tolling, he would have had 365 days in which to file his federal habeas Petition.   He began seeking state collateral review 279 days later, on May 6, 2016, at which time 86 days would have remained on the limitations period.   Statutory tolling, to the fullest extent possible, is available from May 6, 2016 until the denial of the first state habeas petition on October 12, 2016.   He is not entitled to further statutory tolling because he unreasonably delayed in filing his second state habeas petition after the first was denied, and because even if that delay is excused by his transfer between state prisons the second state habeas petition was clearly untimely under state law as his excuse for being unable to file that petition was belied by his filing nearly a dozen *pro se* petitions.   Any available statutory tolling therefore ended, at the latest, on October 12, 2016, and the limitations period expired 86 days later, on January 7, 2017.   Petitioner filed his federal habeas Petition on August 27, 2017, which, even with the benefit of the longest periods of tolling available based on the facts alleged by him, was over seven months after the federal one-year statute of limitations expired.

**E.    Actual Innocence Gateway**

A federal habeas petitioner may avoid the consequences of failing to file within the one-year statute of limitations if he can satisfy the "actual innocence" exception to untimeliness set forth in Schlup v. Delo, 513 U.S. 298, 327 (1995).   "In order to pass through Schlup's gateway, and have an otherwise barred constitutional claim heard on the

merits, a petitioner must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  Majoy v. Roe, 296 F.3d 770, 775-76 (9th Cir. 2002), quoting Schlup, 513 U.S. at 327.

Petitioner interrupted the trial proceedings after the first day of testimony by entering his guilty plea, during which he admitted he was guilty of five of the seventeen charges and admitted he personally used a handgun and personally inflicted great bodily injury. (RT 261-62.)  On the first and only day of trial testimony three eyewitnesses identified him in court as the man who robbed them at gunpoint, and evidence was presented that his DNA was found on a tube of lip balm found in the car he stole where he had been sitting. (RT 112-220.)  He stated that he accepted the plea bargain because he was convinced he would be found guilty (Lodgment No. 5, Augmented Reporter's Tr., Nov. 24, 2010 at 27), and admitted his guilt during the free talk.  (Lodgment No. 4, Augmented Clerk's Tr. at 8-9, 24-46.)  He is clearly not entitled to excuse his untimeliness as a result of the actual innocence gateway.  Schlup, 513 U.S. at 327; Majoy, 296 F.3d at 775-76.

## F.    Motion for Appointment of Counsel

Petitioner contends appointment of counsel is warranted because, based on the evidence presented in support of equitable tolling, he is unable to adequately oppose the motion to dismiss without the assistance of counsel, and that appointment of counsel is required if the Court conducts an evidentiary hearing or orders discovery.  (ECF No. 19.) The Sixth Amendment right to counsel does not extend to federal habeas corpus actions by state prisoners.  McCleskey v. Zant, 499 U.S. 467, 495 (1991); Chaney v. Lewis, 801 F.2d 1191, 1196 (9th Cir. 1986); Knaubert v. Goldsmith, 791 F.2d 722, 728 (9th Cir. 1986). Financially eligible habeas petitioners seeking relief pursuant to 28 U.S.C. § 2254 may obtain representation whenever the court "determines that the interests of justice so require."  18 U.S.C. § 3006A(a)(2)(B); Terrovona v. Kincheloe, 912 F.2d 1176, 1181 (9th Cir. 1990); Bashor v. Risley, 730 F.2d 1228, 1234 (9th Cir. 1984).  The interests of justice require appointment of counsel when the court conducts an evidentiary hearing on the

petition or utilizes the discovery process.  <u>Terrovona</u>, 912 F.2d at 1177; <u>Knaubert</u>, 791 F.2d at 728; Rule 8(c), 28 U.S.C. foll. § 2254; Rule 6(a), 28 U.S.C. foll. § 2254.  The appointment of counsel is discretionary where no evidentiary hearing or discovery is necessary.  <u>Terrovona</u>, 912 F.2d at 1177; <u>Knaubert</u>, 791 F.2d at 728.

"Indigent state prisoners applying for habeas relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations." <u>Chaney</u>, 801 F.2d at 1196; <u>Knaubert</u>, 791 F.2d at 728-29.  Failure to appoint counsel may result in a due process violation if the issues involved are too complex for the petitioner.  <u>Hawkins v. Bennett</u>, 423 F.2d 948, 950 (8th Cir. 1970).  "A district court should consider the legal complexity of the case, the factual complexity of the case, the petitioner's ability to investigate and present his claim, and any other relevant factors." <u>Abdullah v. Norris</u>, 18 F.3d 571, 573 (8th Cir. 1994).

The record does not support Petitioner's contention that the issues are too complex for him to proceed without an attorney.  When he first sought to withdraw his plea he was represented by counsel yet indicated a desire to timely file a pro se motion to withdraw, and was represented by counsel when he decided to abandon his appeal of the denial of that motion.  His federal Petition articulates his claims well, and his opposition to the motion to dismiss demonstrates he has an understanding of this case and the legal issues involved.  Even accounting for his contention that other inmates drafted his federal Petition and his opposition, Petitioner's declaration supports a finding that he understands the nature of these proceedings and has the ability to articulate the necessary factual support for his position, in particular his need for equitable tolling, which is primarily a factual inquiry.  <u>See</u> <u>Spitsyn</u>, 345 F.3d at 799 ("Determining whether equitable tolling is warranted is a 'fact-specific inquiry.'"), quoting <u>Frye v. Hickman</u>, 273 F.3d 1144, 1146 (9th Cir. 2001).  The factual record is adequately developed here, and there is no indication that an attorney would have presented additional facts or a more compelling argument to excuse his five-year delay in seeking federal habeas relief to challenge his guilty plea.  Under such circumstances, there is no abuse of discretion in denying a state prisoner's request for

appointment of counsel, as it is simply not warranted by the interests of justice. See LaMere v. Risley, 827 F.2d 622, 626 (9th Cir. 1987).

In addition, neither discovery nor an evidentiary hearing are required to resolve what Petitioner contends is the only issue presently before the Court, the issue of equitable tolling. The Court has determined that Petitioner's allegations, even if true, do not warrant equitable tolling sufficient to render his federal Petition timely. Therefore, no evidentiary hearing or further development of the record is necessary. See Roy, 465 F.3d at 969 (holding that a habeas petitioner is entitled to an evidentiary hearing when his or her allegations, if true, would support equitable tolling); Roberts, 627 F.3d at 773 (holding that district court did not abuse its discretion in declining to hold evidentiary hearing on equitable tolling where it had access to extensive medical records which indicated petitioner's "relevant mental functions were either 'good' or 'within normal limits,'" and where he "managed to file several petitions for post-conviction relief in state court during the time" he was seeking equitable tolling), citing Laws, 351 F.3d at 924 ("Of course, a petitioner's statement, even if sworn, need not convince a court that equitable tolling is justified should countervailing evidence be introduced.")) Rather, where, as here, "the issues involved can be properly resolved on the basis of the state court record, a district court does not abuse its discretion in denying a request for court-appointed counsel." Hoggard v. Purkett, 29 F.3d 469, 471 (8th Cir. 1994). The Court finds that the "interests of justice" do not warrant the appointment of counsel in this case.

## G. Certificate of Appealability

Finally, the federal rules governing habeas cases brought by state prisoners require a district court that dismisses or denies a habeas petition to grant or deny a certificate of appealability in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. For the reasons stated above, Petitioner has not shown "that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Accordingly, the Court **DECLINES** to issue a certificate of appealability.

## V.    **CONCLUSION**

Based on the foregoing, Petitioner's Motion for Appointment of Counsel is **DENIED**, Respondent's Motion to Dismiss is **GRANTED**, and the Petition for Writ of Habeas Corpus is **DISMISSED** with prejudice as untimely.    Further, the Court **DECLINES** to issue a certificate of appealability.    The Clerk of Court is instructed to terminate the case and enter judgment in favor of Respondent.

**IT IS SO ORDERED**.

Dated:  May 25, 2018

HON. MICHAEL M. ANELLO
United States District Judge